**In re Christine Carter LYNCH, Debtor.**

**Christine Carter Lynch, Plaintiff,**

v.

**United States of America, Internal Revenue Service, Defendant.**

**Bankruptcy No. 99 B 46067(REG). Adversary No. 00/8147A.**

United States Bankruptcy Court, S.D. New York.

Sept. 25, 2003.

Law Offices of Leo Fox, By: Leo Fox, Esq., and Helene C. Bergerbest, Esq., New York City, for Plaintiff Christine Carter Lynch.

James B. Comey, United States Attorney, By: Danielle A. Gentin, Esq., Neil S. Binder, Esq., New York City, for Defendant United States of America, Internal Revenue Service.

## DECISION AFTER TRIAL

ROBERT E. GERBER, Bankruptcy Judge.

The Debtor Christine Carter Lynch brought this adversary proceeding under the umbrella of a case under chapter 7 of the Bankruptcy Code seeking a discharge of the claims of the Internal Revenue Service, totaling approximately $600,000 as of the time of trial, with respect to her tax liability for two groups of tax years—for tax years 1980, 1981 and 1982, totaling approximately $542,000 (the "1980s Taxes"), and for tax years 1993, 1994 and 1995, totaling approximately $55,000 (the "1990s Taxes"). The IRS has opposed her request for relief, with respect to both groups of tax years, contending that she is subject to the statutory exception to discharge of Bankruptcy Code section 523(a)(1)(C) providing that an individual may not be discharged "from any debt . . . for a tax . . . with respect to which the

debtor . . . willfully attempted in any manner to evade or defeat such tax."

A debtor's mere nonpayment of taxes—a matter which is present in every case, and which would make section 523(a)(1)(C)'s requirements surplusage—does not, by itself, satisfy section 523(a)(1)(C)'s requirements. But the caselaw applying section 523(a)(1)(C) has consistently held section 523(a)(1)(C)'s requirements to be satisfied in situations where the debtor—even without fraud or evil motive—has prioritized his or her spending by choosing to satisfy other obligations and/or pay for other things (at least for non-essentials) before the payment of taxes, and taxes knowingly are not paid. Here, with respect to each of the 1980s Taxes and 1990s Taxes, the Court must determine whether that latter principle applies under the facts here. Assuming it does, the Court must also determine, with respect to the 1980s Taxes, to what extent it applies when if the Debtor not acted in that manner, she could not have paid all of the tax debt anyway.

After hearing the evidence, the Court here finds knowing conduct on the part of Ms. Lynch—among other things, spending money on a Central Park West Apartment at a cost of more than $6,000 per month; eating dinner in restaurants four days a week; traveling considerably, to California, China and Paris; running up credit card bills; and making huge gratuitous transfers to her church, all ahead of payment of the back taxes due—of the same type that has been held to constitute a willful attempt to evade the payment of taxes in earlier cases. And the Court further finds that, but for her spending priorities, Ms. Lynch could have paid the majority of the 1980s Taxes—even after payment of the 1990s Taxes, which plainly could have been and should have been paid in full. But the Court further finds that no matter how Ms. Lynch made discretion-

ary spending decisions, she still could not have paid *all* of the 1980s Taxes, which came due, overwhelmingly as a result of the accrual of interest, when she was saddled with tax liability after the collapse of a tax shelter (through no fault of Ms. Lynch) and proceedings before the Tax Court and higher courts that took nearly 10 years to decide.

Applying those facts to the law, the Court determines that:

(1) By reason of Ms. Lynch's conduct, and her failure to pay the 1990s Taxes (which she easily could have paid in full), she must be deemed to have willfully attempted to evade or defeat payment of the 1990s Taxes;

(2) by reason of Ms. Lynch's conduct, and her failure to pay the portion of the 1980s Taxes that she could afford to pay (even though this was less than all of the debt), she must be deemed to have willfully attempted to evade or defeat the 1980s Taxes; and

(3) the latter finding results in the conclusion that *all* of the 1980s Taxes debt is nondischargeable, and not just the portion Ms. Lynch could afford to pay.

A matter that cried out for settlement was not settled, requiring the Court to decide it under law that denies the Court the flexibility to reach the undoubtedly fairer result that a settlement would have.

The following are the Court's Findings of Fact and Conclusions of Law in connection with its determination.

### Findings of Fact

#### A. Background

Ms. Lynch, who was 55 years old at the time of trial, is employed as a municipal bond salesperson at First Albany Securities, in New York City, where she is now a Senior Vice President. She makes sales to institutional clients, such as managers of bond funds and investment portfolios, as opposed to individual investors.

In 1984, Ms. Lynch was diagnosed with a condition called stage one mycosis fungoides, a form of lymphatic cancer, which requires recurring light therapy to stem the occasional flare-ups of the disease.[1] The next year, 1985, Ms. Lynch married her current husband, James Lynch, who also worked on Wall Street. In 1986, Mr. Lynch left his employment and started his own business publishing a municipal bonds newsletter. By 1988, motivated in part by her health issues and in part because "it was challenging for me," Ms. Lynch quit her job in order to assist her husband with the newsletter.

In 1989, Mr. Lynch was hospitalized for extreme hypertension. During 1990, while Mr. Lynch was recovering, Ms. Lynch experienced a flare-up of her mycosis fungoides and was also diagnosed with an ovarian cyst. Her doctor told her that surgery would be necessary, but instead, Ms. Lynch and her husband decided to move to Santa Fe, New Mexico in order to avoid the stress of New York City and aid in their recoveries. In New Mexico, Ms. Lynch and her husband continued to work on the municipal bond newsletter.

In 1992, Ms. Lynch and her husband returned to New York City and she resumed her career selling municipal bonds with Dillon Read & Co., as a Vice President of Municipal Bonds. In 1994, Ms. Lynch left Dillon Read to work for Lazard Freres & Co., where she stayed until La-

---

**1.** This adds a considerable uncertainty to her future earning ability, and affected some of her decisions over the years, though it does not appear to have had a material effect on her earning ability during the time period relevant to this case, from 1996 through the November 1999 time of the filing of her chapter 7 petition.

zard decided to exit the municipal bond business at the end of 1995. At the end of 1995, Ms. Lynch began her position with her current employer, First Albany, where she became a Senior Executive Vice President.

### B. Income

Ms. Lynch is well compensated. She filed tax returns, signing them on the dates noted, showing income during the years noted:

| Year | Date Signed | Adjusted Gross Income |
|------|-------------|----------------------|
| 1993 | 2/17/96 | 182,568 |
| 1994 | 8/20/96 | 235,011 |
| 1995 | 8/20/96 | 218,405 |
| 1996 | 4/12/97 | 478,001 |
| 1997 | 10/12/98 | 317,902 |
| 1998 | 10/15/99 | 289,899 |
| 1999 | 10/15/00 | 281,699 |
| **Total** | | 2,003,485 [2] |

Of course, Ms. Lynch had to pay (or had withheld from her paycheck) income taxes (federal, New York State and New York City) on this new income, leaving a lesser amount to pay the back 1980s Taxes and the unpaid portion of the 1990s Taxes. Based on the relevant tax returns and their accompanying W 2s, the amount of income taxes so paid,[3] and the Adjusted Gross Income net of such payments, is as follows:

| Year | Federal Taxes | NYS, NYC Taxes | AGI Net of Taxes |
|------|---------------|----------------|------------------|
| 1993 | $ 35,513 | $ 21,253 | $ 125,802 |
| 1994 | 58,317 | 26,720 | 149,974 |
| 1995 | 50,621 | 24,622 | 143,162 |
| 1996 | 161,964 | 55,526 | 260,511 |
| 1997 | 99,137 | 36,320 | 182,445 |
| 1998 | 87,150 | 47,363 | 155,386 |
| 1999 | 82,809 | 30,662 | 168,228 |
| **Totals** | **$575,511** | **$242,466** | **$1,185,508** [4] |

### C. The 1980s Taxes

In 1979, when she took a job with First Boston Corporation, Ms. Lynch hired Mr. Martin Weidenbaum, a certified public accountant, to complete her tax returns. Mr. Weidenbaum approached Ms. Lynch with an investment proposal that he said would have advantageous tax benefits. In accordance with her accountant's advice,

---

**2.** The Government contends (PTO Govt. Contentions ¶ N) that Ms. Lynch's income "for the seven years at issue" exceeded $1.9 million, and it is arithmetically correct in this respect, but the Court believes that it is better to parse the years more selectively. The 1990s Taxes initially should have been paid in the period 1993–1996, and especially in 1996, when Ms. Lynch discovered that the sums owing on all three years of those taxes that had not been paid. She learned of the Tax Court decision, and the need to pay the 1980s Taxes, in 1996. Thus the period from 1996–1999 is of particular importance. The total for the years 1996 through 1999 is $1,367,501.

**3.** For federal taxes paid, the Court used the federal tax liability on Ms. Lynch's tax return for the given year, adjusted downward in those years that the full tax liability was not paid and only a lesser sum was paid—when withholding and excess Social Security payments were the only means of payment. For state and city taxes paid, where the returns are not in the record, the Court used the amounts shown on Ms. Lynch's W 2s for the state and city taxes withheld, which might be less than the total paid, on the one hand, or an overpayment, on the other. For 1998, where the W 2 did not show the state tax withholding, the Court used Ms. Lynch's Schedule A.

**4.** Of this, the total for the years 1996 (when the Tax Court ruling came down) through 1999 is $766,570.

Ms. Lynch purchased a partnership unit in White Rim Oil and Gas Associates ("White Rim"), a publicly offered tax-sheltered investment. During the course of the next few years, White Rim generated losses, allocable to its partners, for which Ms. Lynch took deductions on her 1980, 1981 and 1982 taxes based on her distributive share of those losses. Ms. Lynch testified, in testimony the Court finds credible (and indeed, Ms. Lynch and the IRS stipulated to this in the Pretrial Order), that in taking the deductions, she relied on Mr. Weidenbaum's advice and the tax opinion in the prospectus in connection with the investment offering. The IRS has not suggested, nor does the Court find, that the White Rim deductions taken by Ms. Lynch were taken in other than good faith.

But after an audit of White Rim, the IRS disallowed the losses taken by White Rim, and hence, the losses allocated to White Rim partners. Believing her deductions to be legitimate based on Mr. Weidenbaum's advice, and understanding that White Rim itself was opposing the IRS' decision, Ms. Lynch, by an attorney, Larry Jay Kushner, Esq., filed a petition for judicial review with the United States Tax Court, in November 1987.[5]

Presumably in conjunction with a fair number of other cases, Ms. Lynch's tax court case was consolidated for disposition under a coordinated cases caption "Elektra/Hemisphere Tax Litigation"—a name apparently based on the name of White Rim's sponsor. Some or all of these cases were determined based on a test case, *Krause v. Commissioner*,[6] in which, ac-

cording to a decision of the Tenth Circuit in another case,[7] "following a fifteen-week hearing," the Tax Court held that Elektra/Hemisphere partnerships "lacked a profit motive," giving rise to a disallowance of losses and assessments of increased interest.

For one reason or another (but presumably because of the complexity of the Elektra/Hemisphere Tax Litigation and/or the need for the trailing cases to follow the disposition in *Hildebrand/Krause*, which went all the way to the Supreme Court), the Tax Court did not render a decision in Ms. Lynch's case until nine years later, on October 3, 1996. In litigation in the Tax Court (and in contrast to tax litigation in the district court or Court of Claims),[8] the taxpayer need not pay the disputed taxes and wait for a refund from the IRS if one prevailed. Mr. Weidenbaum was convinced that the White Rim loss deductions would prove legitimate and counseled Ms. Lynch not to pay any money against the 1980s Taxes before the Tax Court's determination. In order to avoid further litigation with the IRS in the retrieval of that money, Ms. Lynch therefore availed herself of the opportunity to await the result of the Tax Court litigation. She failed to pay, bond the taxes claimed, or otherwise satisfy the disputed tax obligations to prevent the accumulation of interest on the principal amount in question.

Although the Tax Court ruled that additional taxes were due from Ms. Lynch and other taxpayers similarly situated (along with interest, at a higher than usual rate, because the Elektra/Hemisphere tax shel-

---

**5.** Pl. Exh. 20.

**6.** 99 T.C. 132, 1992 WL 178601 (1992), *aff'd sub nom. Hildebrand v. Commissioner*, 28 F.3d 1024 (10th Cir.1994), *cert. denied*, 513 U.S. 1078, 115 S.Ct. 726, 130 L.Ed.2d 631 (1995) (*"Hildebrand/Krause"*).

**7.** *See Martin v. Commissioner*, 232 F.3d 901, 2000 WL 1664261 (10th Cir.2000) (unpublished opinion) (*discussing Hildebrand/Krause*).

**8.** *See* Tr. Trial Day # 1 at 278–279.

ters were deemed to be "tax motivated transactions"), it held that those taxpayers would only be held accountable for the taxes and interest, and not additional penalties. Nevertheless, by reason of the substantial passage of time between the filing of the original returns for the 1980s taxes and the Tax Court determination, Ms. Lynch's tax liability, which originally was approximately $57,000, swelled to approximately $360,000 by December 1996.[9]

That balance increased further with the additional passage of time. As of May 29, 2001 (shortly before the time of filing the Pretrial Order), Ms. Lynch's tax liabilities for the 1980s Taxes were:

| Year | Tax Owed | Interest Owed | Penalty Owed | Total Owed |
|------|----------|---------------|--------------|------------|
| 1980 | None | $189,665 | $ 2,304 | $191,969 |
| 1981 | $21,441 | $192,825 | $ 9,688 | $223,954 |
| 1982 | $13,990 | $105,169 | $ 6,892 | $126,051 |
| Total | $35,431 | $487,659 | $18,884 | $541,974 |

The Court does *not* find that by investing in the White Rim tax shelter; or by taking the deductions that were thereby offered (with the prospectus having represented that the deductions properly could be taken, and her accountant having advised that they properly could be taken); or by appealing to the Tax Court; or by availing herself of the option under law not to pay first while Tax Court litigation was pending, Ms. Lynch acted improperly in any way.[10] To the contrary, the Court finds, as Ms. Lynch argued, that each of those measures was entirely appropriate, and agrees with Ms. Lynch that her conduct with respect to the 1980s Taxes up to the fall of 1996 was in good faith and did not evidence any steps to evade or defeat payment of a tax.

9. *See* Pl. Exh. 37.

10. Likewise, it is not argued, and in any event the Court does not find, that Ms. Lynch was responsible in any way for the nine-year period during which the issues relating to the

*D. The 1990s Taxes*

The debt with respect to the 1990s Taxes is less understandable in origin. The 1990s Taxes arose because Ms. Lynch failed to make any tax payments for those years, other than those made as a consequence of her employer's routine withholding of taxes from her paycheck. In each of the tax years in question, the taxes withheld were less than her total tax liability, and she took no steps to pay the difference, either by estimated payments or by payment with the submission of her tax return for the relevant year. Ms. Lynch's difficulties with respect to the 1990s Taxes were further aggravated by her grossly late filing of returns for the 1993 and 1994 tax years, two of the three years in question.

Ms. Lynch testified, and the Court accepts as truthful, that Ms. Lynch's accountant Mr. Weidenbaum was supposed to prepare her tax returns, and that he had assured her that he did for all years until and including 1995. She further testified, and once more the Court accepts this as truthful, that she had routinely provided Mr. Weidenbaum with the documents necessary to prepare the taxes for each tax year.

But Ms. Lynch appears then to have been wholly unmindful of her tax return *filing* obligations for a very long period of time. Her accountant Mr. Weidenbaum did not prepare, or at least sign, the 1993 return until January 1995 (almost nine months late), and Ms. Lynch did not sign the return until February 1996, almost two years late.[11] She similarly signed and filed

Elektra/Hemisphere tax shelters were before the Tax Court or higher courts.

11. See Govt. Exh. II. When Ms. Lynch's 1993 return was filed by Mr. Weidenbaum in 1995, it was apparently filed without her signature,

her 1994 return more than a year late—not until August 1996.[12]

How or why Mr. Weidenbaum, an accountant presumably experienced in the preparation of tax returns and filing requirements, could have filed Ms. Lynch's return so late, and without first securing her signature, is a mystery, or series of mysteries,[13] but for the purposes of this analysis, the Court believes it more appropriate to focus on *Ms. Lynch's* actions and knowledge. Having filed so many returns in the past, and being a citizen of above-average intellect and sophistication, she could not have been ignorant of the requirement that taxpayers sign and timely file tax returns.

The Court finds Ms. Lynch's explanations with respect to the returns for 1993 and 1994 to be empty. Though the Court does not go so far as to find that Ms. Lynch was untruthful to the Court in stating that she believed that Mr. Weidenbaum had filed the 1993 and 1994 returns on her behalf, it cannot accept her testimony that she was unaware of her failure to file the tax returns for these years until she met with her new accountant, Al Mindes. Taxpayers must sign their own tax returns, a fact that is known to every taxpayer who has ever obtained professional assistance in tax preparation, and taxpayers must file their tax returns or cause them to be filed. The Court necessarily must find that Ms. Lynch, after so many years of employment, either knew this or recklessly disregarded this—and in either case, knowingly failed to file those returns.

The Court is also not in a position to find, as Ms. Lynch's counsel urges, that

and a "duplicate return" appears to have been received by the IRS in April 1996. See Govt. Exh. QQ at page 10182.

her non-payment of taxes for the 1993–1995 years was not a knowing failure because she had in fact paid a significant portion of the taxes due for those years. The taxes that were paid were only those that were automatically withheld from her salary by her employer. Ms. Lynch made no volitional payments on her part—either by payment of estimated taxes or payment with the filing of a tax return—whatever.

As a result, taxes due with respect to the 1993–1995 tax years, as of the time of finalization of the pretrial order, were as follows:

| Year | Tax Owed | Interest Owed | Penalty Owed | Total Owed |
|---|---|---|---|---|
| 1993 | None | $ 5,712 | $ 3,933 | $ 9,645 |
| 1994 | $6,812 | $ 8,681 | $ 5,136 | $20,629 |
| 1995 | $13,165 | $ 7,847 | $ 4,296 | $25,308 |
| Total: | $19,977 | $22,240 | $13,365 | $55,582 |

### E. Efforts to Satisfy the Tax Liabilities

In January 1996, prior to entry of the judgment of the Tax Court, but after the decisions in *Hildebrand/Krause* which would preordain the result, Ms. Lynch engaged in dialogue with Joyce Phillips, an Appeals Officer in a Houston office of the IRS, in order to resolve the amount of her liability. At some point before that, Ms. Phillips had mailed a proposed stipulation-decision to Ms. Lynch's counsel, Larry Kushner, to be signed and filed with the Tax Court. Receiving no response, Ms. Phillips made repeated, but ultimately unsuccessful, efforts to reach Mr. Kushner. Ms. Lynch had similar difficulties in finding Mr. Kushner, and during this period met with a new accountant, Al Mindes, for tax advice.

12. See Govt. Exhs. JJ; QQ at page 10185. This return was prepared by Ms. Lynch's new accountant, Al Mindes.

13. Mr. Weidenbaum died in 1996.

In a letter to Ms. Lynch advising her of the outcome of *Hildebrand/Krause* (in what appears to be based on a template for the many taxpayers who had invested in Elektra/Hemisphere tax shelters and were similarly affected), the IRS advised her, among other things:

> We believe concerns regarding the ability to pay the amounts due should not further delay closing of these cases, but *we will coordinate requests for installment agreements and offers in compromise.* Please bring these types of issues and concerns to our attention as soon as possible.[14]

Ms. Lynch employed Mr. Mindes to make such requests. In December 1996, Ms. Lynch and her accountant submitted an "Offer in Compromise," based upon a showing that "I can't pay." She offered to satisfy the amounts due, then said to be approximately $360,000, for $90,000—with $30,000 upon acceptance and with three further installments of $20,000 over the course of 1997.[15]

In her Offer in Compromise, Ms. Lynch listed her monthly income as $26,667 and her total necessary monthly expenditures as $27,325, resulting in a net deficit every month. These monthly expenses were said to include, among others, $6,398 for housing and utilities; $7,175 for "National Standard Expenses";[16] $513 for tuition; $792 for 401k contributions; $1,104 for "church donations"; $208 for gifts; $721 for non-reimbursed trips; and $244 for entertainment.[17]

She stated, in connection with her offer, among other things:

> At least 50% of my gross revenue comes from one customer.
>
> I have a pre-lymphoma condition which causes skin lesions which lead to a nervous condition which could effect (*sic.*) my job continuity.
>
> In reviewing my expenses it appears high but a major portion of these expenses maintain my position and ability to work for as long as possible....
>
> I do not think I could pay this debt during my life time and am hoping I can put my life behind me and go forward with a clean slate for as long as I am able.[18]

In February 1997, approximately two months later, the IRS rejected that offer, expressing its view that Ms. Lynch could pay more than the $90,000 offered.[19]

Its letter stated, in full relevant part:

> We can't accept your offer for the following reason(s):
>
> Our investigation shows that we could collect a larger amount than you offered. We don't have the authority to accept an offer in this circumstance.[20]

"Based on further review," in July 1997, an appeals officer of the IRS adhered to the earlier determination. His letter stated, once more in full relevant part:

> [T]he Government is forced to reject her offer. It is the position of the Government that a higher amount can be collected then [*sic.*] is offered.[21]

---

**14.** Pl. Exh. 60 at 2.

**15.** P. Exh. 37.

**16.** Clothing and clothing services, food, housekeeping supplies, personal care products and services, and "miscellaneous." *See* Pl. Exh. 37.

**17.** Pl. Exh. 37. The Court addresses those living expenses below.

**18.** Pl. Exh. 37 at 2.

**19.** Pl. Exh. 38.

**20.** *Id.*

**21.** Pl. Exh. 39.

The IRS then denied an appeal of that determination. Its letter (signed by a presumably higher person in the same office, though telling the taxpayer to respond to the individual who had written the July letter) stated, once more in full relevant part:

> We are sustaining the rejection of your offer because the tax is legally due, and we believe an amount larger than your offer is collectible.[22]

None of the three IRS letters articulated any quantified financial analysis of what Ms. Lynch could or should pay, nor what she would need to pay in order to secure IRS acceptance of her offer. Nor does the record reflect any unwritten communications between Ms. Lynch or her accountant, on the one hand, or the IRS, on the other, with respect to that subject, or any negotiations between Ms. Lynch and the IRS to reach agreement on a mutually satisfactory payment amount.[23]

In August of that year, Ms. Lynch, with the assistance of new accountants, initiated an ultimately unsuccessful effort to secure an abatement of interest based on what appears to this Court to have been a litigation long-shot (accusing the IRS of delay in taking a ministerial act while Ms. Lynch's case was before the Tax Court, a separate entity). In February of the following year, she made a Freedom of Information Act request of the IRS for "*every* item in my file (including *all* correspondence)." [24] After two months considering her request, the IRS wrote Ms. Lynch advising her that "we need more time to locate and consider releasing IRS records which you have requested," advising of an intention to respond after another 30 days.[25]

Ms. Lynch then proposed an installment plan with the IRS, which was rejected as inadequate. In an August 1998 IRS Form 433 A, captioned "Collection Information Statement for Individuals," she set forth living expenses even higher than those she had identified in her December 1996 Offer in Compromise.[26] In a letter dated December 1, 1998, stating that she had been asked to provide further explanation and documentation for some items on her financial disclosure form, Ms. Lynch stated, among other things:

> Please note that my income fluctuates because I am a commission salesperson. . . . I am currently in deficit to my firm in the amount of approximately $16,000. There is no guarantee that my draw will stay where it is during 1999. You will note that my income has decreased each year for the past two years. . . .

---

22. Pl. Exh. 41.

23. If such communications or negotiations occurred, the Court believes they likely would have been mentioned in the trial, particularly when the Court asked the IRS witness, under Fed.R.Evid. 614, whether there is customarily a "give-and-take process between the taxpayer and the IRS that many people might associate with a negotiation" and the IRS witness responded merely with an observation that "anything could happen." (*See* Tr. Trial Day # 1 at 242–243). If there were no such communications or negotiations, which the Court regards as likely, that brings credit upon neither side.

24. Pl. Exh. 47 (emphasis in the original).

25. Pl. Exh. 50. While the Court is not impressed with the substance or timeliness of the IRS response, it cannot say that either Ms. Lynch's request, or the IRS response, was relevant in any material respect.

26. Pl. Exh. 51. Her housing expenses were now said to be $6,898 ($500 higher), and her 401–K contribution increased from $792 to 1,104 per month. The previous entry for "non-reimbursed trips" was now described as "non-reimbursed business expenses," with no change in amount.

Please note that my rent will be increased in June of 1999. My husband's name is shown with mine on the lease so that if I were to die he would legally be able to remain in our apartment—with no hassle—until he was able to make other arrangements. We set our utility and household insurance accounts up in a similar fashion. . . .

I am an ordained minister in the Church of the Movement of Spiritual Inner Awareness. . . . I am currently studying toward a Doctorate Degree in Spiritual Science. My class study comprises one entire week-end per month in California. This course of study will not be completed until the year 2000 or 2001 at the earliest—as with Doctoral work the ending time table is not always predictable.[27]

In March and April 1999, Ms. Lynch made two payments to the IRS of $2,000 each, as a measure of good faith, which the IRS applied to her 1994 taxes.[28] So far as the Court can determine, however, these were the only payments Ms. Lynch made toward the sizeable tax liabilities she faced.

At some point between December 1998 and April 1999, the IRS advised Ms. Lynch that it would accept an installment plan of $3,846 per month. In response, and apparently to avoid levy or seizure, Ms. Lynch's accountants filed a Collection Appeal Request on April 27, 1999 to have the sum reduced to $2,800 per month.[29] Her offer was rejected as inadequate.[30]

### F. Chapter 7 Filing and Related Adversary Proceeding

Faced with the mounting tax liabilities, Ms. Lynch filed a voluntary petition under chapter 7 of the Bankruptcy Code on November 3, 1999. By order dated April 17, 2000, she was granted a discharge with respect to all debts dischargeable under the Bankruptcy Code. She commenced this adversary proceeding on May 3, 2000, raising the issue of the dischargeability of the 1980s Taxes and 1990s Taxes.

### G. Housing Expenditures

At approximately the time of their return to New York, in September 1992, Ms. Lynch and her husband rented an apartment on the west side of Manhattan on a month-to-month basis, until they found an apartment in a brownstone on West 105th Street. After a year at the 105th Street brownstone, Ms. Lynch and her husband moved into a three-bedroom apartment on Central Park West; it had an initial monthly rent of $5,200, and by December 1996, Ms. Lynch was paying approximately $6,400 per month in rent and utilities, and by August 1998, was paying approximately $6,900 per month for such items.

Ms. Lynch's husband was and is also on the lease. The testimony as to his financial contributions to the household was vague and in some respects contradictory.[31] Assuming, however, that all of this

27. Pl. Exh. 53.

28. Govt. Exh. QQ at 10185; Tr. Trial Day # 1 at 131, 235–236.

29. Pl.Ex. # 55.

30. In the trial on this matter, Ms. Lynch initially offered two letters written by the IRS after the filing of Ms. Lynch's chapter 7 case, Pl. Exhs. 57 and 58, which could well be read as manifesting an IRS awareness that even if

Ms. Lynch made very substantial payments under an installment arrangement, her debt to the IRS nevertheless could not be paid in full. However, to avoid opening the door with respect to questioning on post-petition matters, counsel for Ms. Lynch withdrew Pl. Exhs. 57 and 58. See Tr. Trial Day # 1 at 124–129, Tr. Trial Day # 2 at 72–75.

31. Mr. Lynch did not testify, but was deposed. At various times, Ms. Lynch testified that "he contributes to the household, too," Tr. Trial

testimony was fully truthful, it tells the Court that Ms. Lynch had additional financial resources provided by her husband, making her satisfaction of her financial responsibilities easier. This makes her failure to meet her tax obligations more inexplicable.

In testimony that the Court notes but does not find credible, Ms. Lynch testified at some length that living in the places she has, particularly on Central Park West, has been necessary as a professional matter. With respect to her residence in the 105th Street Brownstone, she testified that she and her husband "needed to have space for my husband's business and for me to be able to entertain clients and things like that."[32] Similarly, Ms. Lynch testified that living in her Central Park West apartment was necessary to her personal relationships with her clients, to which she attributes much of her professional success.[33] Most of Ms. Lynch's clients live outside New York, and she maintains that it is important to entertain them in her apartment, and provide a place for them (and their families) to stay while they are in New York.[34] Ms. Lynch claims that in a business that "is totally a telephone business," where all but one of her three major clients lives out of town, "[i]t is nice to be able to offer them time to come, you know, to New York and stay."[35]

In Ms. Lynch's view, housing clients and their families, along with taking them to dinner and to productions at Radio City Music Hall, are all important ingredients in establishing the "persona of a successful person," which she contends is necessary for her success in bond sales.[36] In addition, Ms. Lynch asserts that her address on Central Park West is a prestigious address that is acceptable to her clients, as contrasted to her former address on West 105th Street. Ms. Lynch also testified that the Central Park West location for an apartment was important to her because it was necessary that she live within close proximity to her office and her doctors.[37]

However, the Court rejects as not credible the notion that Ms. Lynch had to live on Central Park West for success in her business or for any other reason. Entertaining at home may be helpful to one's business, but it defies belief to assert that it is essential, and it particularly defies belief to suggest that Ms. Lynch's stated need for client entertaining justified a residence of that cost, especially where it was not suggested that the at-home entertain-

Day # 1 at 143; "[m]y husband contributes indirectly, but I write the [rent] checks," Tr. Trial Day # 2 at 50; "[h]e contributed to the household expenses, you know, generally. So, you know, if it's rent, directly, I can't say," id.; she did not know what her husband had made for any years since they had been back in New York, as "[h]e handles his finances pretty much on his own," id. at 53; and that at least during one year, he contributed $30,000 to the household. Tr. Trial Day # 1 at 185.

32. Tr. Trial Day # 1 at 63. She later testified that her address on 105th Street caused some of her clients to "actually cringe . . . Whatever their own agendas are, they don't think that is where someone like me should live." *Id.* at 68.

33. Tr. Trial Day # 1 at 66.

34. Tr. Trial Day # 1 at 66–67.

35. Tr. Trial Day # 1 at 66–67. She continued that "[a]nd one of my clients has two little children. And they always come at Christmas, and we go to the Radio City show and that kind of thing. And I also entertain during like dinner and stuff like that for my clients, my client who is in town. It is also a place where we can do, I can do . . . kind of prospecting a little bit by having other people over. So that is an ingredient of my business that is important."

36. Tr. Trial Day # 1 at 67.

37. Tr. Trial Day # 1 at 68–69.

ing was more than episodic. If and to the extent client entertaining is necessary or desirable, clients can be entertained at places other than one's apartment, at least until one's taxes are paid.[38]

The Court finds that with or without assistance from her husband, Ms. Lynch spent amounts on housing that greatly exceeded any amount that might be necessary and appropriate for a family of two adults without children.

### H. Personal Expenditures

Ms. Lynch's Chase credit card statements for the 1996 through 1999 time periods reflect very substantial charges, and payments, on her account. Monthly new charges on the credit card averaged $2,486 monthly, or $29,832 annually. The aggregate on the card, from November 1996 through November 1999 was $94,484. The credit card balance was paid late, or less than in full, during a number of the months from 1996 through April 1999, but thereafter was paid in full each month. Ms. Lynch showed no credit card debt on her schedules when her bankruptcy case was filed—indicating to this Court that she elected to pay down the credit card debt so incurred as a higher priority than payment on her taxes.[39]

Review of the transactions shown on the credit card invoices leads the Court also to infer that the great bulk of the credit card charges were for items that could fairly be regarded as discretionary spending. The Court finds that Ms. Lynch made substantial expenditures on personal expenses greatly beyond those that could fairly be regarded as necessities.

### I. "Tithing" and Other Religious and Charitable Expenditures

Beginning in the mid-eighties, Ms. Lynch and her husband have been members of a religious organization called the Movement of Spiritual Inner Awareness.[40] Ms. Lynch is an ordained a minister in this faith.[41] She has made expenditures in connection with her spiritual education of thousands of dollars, on repeated trips to California—apparently monthly[42]—and once to China.

Ms. Lynch also engages in the practice of "tithing,"[43] which calls for her to give ten percent of her "increase"[44] to the church each year. She noted in her testimony, however, in response to the Court's question as to whether her tithing was required or was optional, that "No, it is not

---

**38.** The Court notes that Ms. Lynch would be reimbursed by her employer for entertaining existing clients. *See* Tr. Trial Day # 2 at 126.

**39.** *See* Govt. Exh. TT. It does appear that Ms. Lynch secured a salary advance of approximately $36,000 from her employer at just about the time that the Chase credit card debt was repaid, and it is a reasonable inference that at least some of this was used to repay the credit card debt. The Court again notes that while the credit card debt was paid, the outstanding tax liabilities were not.

**40.** Tr. Trial Day # 1 at 137–138.

**41.** Tr. Trial Day # 1 at 139.

**42.** *See* Pl. Exh. 53 (spends one weekend per month in California). The Court is not sure

what the cost of that was or where she showed the cost of travel on the financial information she provided to the IRS.

**43.** Tr. Trial Day # 1 at 136.

**44.** "[Increase] is a word we use just to say—it is not just income. It is like some people tithe on gifts, you know, things like that. It is really a personal thing. People, like someone's wife who might not work so she does not have an income, she might place value on something other than income that she would base her tithe on that she might do out of her household money or allowances or whatever." Tr. Trial Day # 1 at 140.

required." [45]

In addition, Ms. Lynch makes significant charitable contributions to organizations related to the Movement of Spiritual Awareness, such as the Institute for Individual and World Peace, the Heartfelt Foundation and others. She has also paid considerable sums for religious tuition.

Ms. Lynch estimated the cost of her religious and charitable contributions to be $13,248 per year, and her tuition to be $6,153 per year.[46] Subsequent to notification by the IRS of her cumulative and growing debt, Ms. Lynch reported charitable contributions on her 1996, 1997, and 1998 tax returns of $15,989, $14,301, and $17,624, respectively.[47]

The Court finds that while Ms. Lynch (like any other American) is free to practice her religion as she sees fit, her tithing is not required; she has elected to make gratuitous transfers to the religious and other charitable organizations before paying her taxes; and that she knew in making those gratuitous transfers, she was preferring those organizations over her duty to pay the taxes she owed. The Court finds that none of these payments—totaling almost $20,000 per year—was a necessity.

## J. Other Lifestyle Matters

During the period from 1996, when she learned of her tax liability, to the present, Ms. Lynch has maintained her lifestyle and spending habits without any evidence of alteration. Assertedly due to long working hours, Ms. Lynch and her husband eat out at restaurants about four times a week, at a cost of $50 per person per meal,[48] or $11,000 per year. In addition, in 1998, Ms. Lynch estimated her yearly expenditure on food and holistic supplements, *excluding restaurant expenses,* to be $18,000, which averages approximately $50 per day.[49] She also spent $773 per month (or $9,276 per year) for transportation (including transit, taxis and rental cars),[50] explaining "I take a lot of cabs." [51] That is very high for a Manhattan resident.

In 1999, the year Ms. Lynch filed her chapter 7 case, she admitted to taking eight or nine trips to California, always staying in hotels. From 1996 to 1999, the years Ms. Lynch was in negotiations with the IRS, she and her husband took vacations, including one to Paris. Additionally, the summer after Ms. Lynch filed for bankruptcy relief for inability to repay her debt to the IRS, she paid for herself and her husband to travel to China at a cost of approximately $10,000 per person.

45. Tr. Trial Day # 1 at 140.

46. Pl. Exh. 51.

47. Govt. Exhs. LL, MM, NN. Interestingly, before Ms. Lynch learned of the IRS decision and was the subject of increasing efforts by the IRS to collect the taxes due, her donations to charity in 1993, 1994, and 1995, were $2,158, $5,730, and $4,751, respectively (Pl. Exhs.7,8,9)—amounts approximately one-third of her subsequent donations in 1996, 1997, and 1998. The increase, in that amount and at that time, is troublesome, and tends further to bolster the Government's contention that Ms. Lynch took knowing steps to evade the payment of taxes, or, at the least, knowingly prioritized her spending in a manner that preferred other expenditures over the payment of taxes.

48. Tr. Trial Day # 2 at 55. She does so because "it just works better for me to not to have to come home and cook." Tr. Trial Day # 1 at 141–142. "It just supports me. It is better for me to do that." Tr. Trial Day # 2 at 55.

49. Tr. Trial Day # 1 at 174; *see* Pl. Exh. 51.

50. Tr. Trial Day # 2 at 66–67.

51. Tr. Trial Day # 2 at 67.

Ms. Lynch also elected to lend $25,000 to her husband's business, though it appears that this money was repaid.[52]

### K. Cancellation of Direct Deposit

By notices dated February 10, 1997, and February 24 1997, with each captioned "Final Notice!!", the IRS advised that "We intend to levy."[53] As noted above, the IRS rejected Ms. Lynch's Offer in Compromise by letter dated February 21, 1997.[54] Ms. Lynch received this letter on February 25, 1997.[55] Seven days later, on March 4, 1997, Ms. Lynch—who was previously paid by direct deposit, which makes funds immediately available and is plainly a convenience for employees—wrote to the payroll department of her employer to cancel it:

> Please cancel my direct deposit. Until further notice, I would like to receive a check. If possible, please make this effective as of the current pay period.[56]

The Court is compelled to find that the proximity in dates is not a coincidence, and that the cancellation of paycheck direct deposit not just followed the IRS rejection of Ms. Lynch's offer and the IRS notices of an intent to levy (which expressly included threats to "(take) ... your paycheck"), but was the result of such. The Court similarly is required to reject Ms. Lynch's testimony suggesting otherwise as not credible.[57] The Court finds that the purpose of the change was to make it more difficult for the IRS to garnish Ms. Lynch's salary, as the IRS had threatened to do in its notices to Ms. Lynch—the most recent of which was dated eight days earlier, and presumably received at an even more proximate time.

The Court is likewise compelled to find that apart from the decisions by Ms. Lynch to allocate financial resources for the payment of obligations other than taxes, the cancellation of paycheck direct deposit constituted an affirmative act to evade the payment of taxes.[58]

---

52. Tr. Trial Day # 1 at 142; Tr. Trial Day # 2 at 78.

53. Govt. Exhs. G, Q.

54. Pl. Exh. 38.

55. Id.

56. Govt. Exh. XX.

57. Ms. Lynch testified that she did not recall why she did that, Tr. Trial Day # 1 at 193, adding "There was so much going on in my life. There were a lot of changes in the firm. I really don't recall what motivated me to do that." Id. at 193–194. While she further testified that she thereafter continued to deposit paychecks in her bank account, Tr. Trial Day # 2 at 116, and knew that a garnishment or attachment could be placed on her bank account anyway, id. at 117, the Court nevertheless believes that the request to cancel direct deposit, right after receiving notices of the rejection of her Offer in Compromise and of the IRS' intent to levy, was for the purpose of making such levies more difficult.

58. The Court does not make a like finding with respect to Ms. Lynch's June 1996 election to make the maximum 401–K contribution permitted under law, see Govt. Exh. BBB, or her 1998 election to participate in her firm's Flexible Benefit Plan, see Govt. Exh. YY. Availing oneself of benefits of that character, and in those amounts, is routine and innocuous for hundreds of thousands of employees, if not more, and the time nexus is insufficient for the Court to draw any inferences in that respect. The IRS failed to meet its burden, by a preponderance of the evidence, to show that these elections constituted an affirmative act to evade.

> The Court does believe, however, that Ms. Lynch's decision to allocate resources toward 401–K Plan investment, rather than to the payment of taxes, is another species of discretionary payment, and hence is relevant to the Government's principal argument, that Ms. Lynch elected to apply her resources to matters other than the payment of her taxes. The Court further believes, however, that her contributions to the Flexible Spending Plan should not be

The Court does not believe, or find, that these measures to avoid garnishment were ultimately material in effect—as they ultimately had no effect on the ability of the IRS to recover the sums due to it, and the IRS could, if it wanted, reach her salary and bank account with or without direct deposit—but the Court does believe, and find, that these measures are inconsistent with Ms. Lynch's position that she was genuinely interested in satisfying her tax liabilities, and that they impair her ability to contend that she is the "honest but unfortunate" person for whom bankruptcy relief was designed.[59]

## L. Ultimate Conclusions

Based on those facts, the Court finds that Ms. Lynch knowingly spent several thousand dollars per month on discretionary expenditures that could not reasonably be regarded as essentials, knowing that her tax obligations had to be satisfied, and were unpaid. The Court accepts as truthful Ms. Lynch's testimony that she did not think of herself as a tax evader,[60] but also finds that she knowingly and intentionally led her life in a manner that had exactly that effect. It finds that she knowingly

elected to live her life as usual when taxes remained unpaid, and that she knowingly and consciously prioritized her spending, giving priority to every one of the discretionary expenditures discussed above over payment of her taxes.

The amount that could be regarded as excessive, while incapable of measurement with exact precision, was at least $4,000 per month, or $48,000 per year, and could in fact be much larger.[61]

Thus, for the four years 1996 (the year the tax liabilities appeared) through 1999 (the date of her bankruptcy filing), it is fair to conclude that but for her discretionary spending decisions, Ms. Lynch could have paid down at least $192,000 of the approximately $600,000 due, and for the eight years from 1996 through the present, $384,000 of the approximately $600,000 due—a meaningful portion (indeed, more than half) of her tax debt. The Court believes that it is also fair to conclude that for so long as she earns $300,000 or more (which the Court assumes she could until retirement, probably 5–8 years away), she could continue to make payments of approximately the same amount.

---

regarded similarly. Payments into such plans have the effect of converting payments for medical expenses into tax deductible payments, and are lost to the taxpayer when deposited. In addition, the underlying obligations for medical services are a non-discretionary necessity, and cannot be regarded as elective.

59. See pages 81–82 below.

60. Tr. Trial Day # 1 at 196–199.

61. As the need to invest for retirement is debatable, the Court assumed, without deciding, that Ms. Lynch should not be penalized for that. But in reaching the conclusion noted above, the Court (conservatively) assumed that Ms. Lynch and her husband could get by with housing and utility expenses of $4,000 per month, with the result that the remaining

$2,900 was excessive. The Court also assumed that the bulk of the items Ms. Lynch listed-amounts for "church membership" ($1,044 per month); "gifts" ($208 per month); "entertainment" ($244 per month); transportation ($773 per month)—could be regarded only as discretionary. Additionally (and wherever they appeared in her budget), the Court considered Ms. Lynch's monthly trips to California, and dining out four times per week, to be discretionary, and believes that these would likely total close to $1,000 per month. These amounts would greatly exceed $4,000 per month, of course—in fact they would exceed $6,000—but by reason of the inherent uncertainty with respect to individual items, and the fact that every expenditure in every category likely could not be regarded as discretionary, the Court is more comfortable using the lower figure.

The IRS properly recognized that Ms. Lynch could afford to pay much more than the $90,000 she offered in her Offer to Compromise. But Ms. Lynch could not be expected to pay the entirety of her tax debt without a reduction in it. This is so, in the Court's view, with or without an installment plan, and with or without borrowing, on her 401–K balance or anything else.[62]

The Court finds that Ms. Lynch could have easily paid the 1990s taxes. Initially, these taxes were the relatively small amounts of $11,567 for 1993; $10,812 for 1994; $13,577 for 1995, and even with interest grew to the relatively small amount of $55,000, in the aggregate, just before the trial of this matter. Ms. Lynch made approximately $126,000, $150,000, and $143,000 respectively, after the payment of her other federal and state taxes, in the years in question, more than enough to pay the amount due, and live comfortably.[63]

The Court finds that at least a majority, but not all, of the 1980s taxes—approximately $360,000 in 1996, and approximately $542,000 before trial—could have been paid in meaningful amounts but for the manner in which Ms. Lynch prioritized her spending.

## Discussion

### I.

### *General Principles*

Some, but not all, federal income tax liabilities can be discharged in a bankruptcy case. Under the Bankruptcy Code, a debtor may be discharged from federal income tax liabilities for any tax year for which a return was due more than three years prior to the filing of the bankruptcy petition, though a debtor cannot be discharged from more recent tax liabilities.[64] But even for tax liabilities relating to the time period for which discharge is normally granted, a debtor may not be discharged from a debt for a tax if the debtor "willfully attempted in any manner to evade or defeat such tax." [65]

 The IRS bears the burden of proving nondischargeability by a prepon-

---

**62.** The inability of either side to recognize these fairly obvious conclusions, or to act upon them, brings credit upon neither side. If Ms. Lynch had recognized that she could not live her life as usual, choosing to make one expenditure after another before payment of her taxes, she would be in a far better position in seeking dischargeability. If the IRS had dealt with Ms. Lynch's situation with other than minimally-informative bureaucratic responses, it might have recovered the collectible amount without litigation, and saved the U.S. Attorneys' Office in this district the very substantial effort that office expended in defending the Government's interests in this case.

**63.** She had an even greater ability to pay them in 1996, the year she apparently discovered she had not paid them earlier, when she made $478,000 before income taxes, and $260,000 after them.

**64.** That results from a combination of two sections of the Code. Bankruptcy Code section 507(a)(8)(A) grants the more recent taxes a payment priority over other unsecured claims. Then, section 523(a)(1)(A) provides that a discharge under, *inter alia*, section 727 (the discharge provision in chapter 7 cases) does not discharge an individual debtor from such tax debts—"of the kind and for the periods specified in" section 507(a)(8)(A).

**65.** Bankruptcy Code section 523(a)(1)(C). Section 523 provides, in relevant part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
(1) for a tax or a customs duty—
...
(C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax....

derance of the evidence.[66] "The allocation of the burden of proof to the IRS reflects the well settled rule that exceptions to discharge must be strictly construed against the creditor and liberally in favor of the honest debtor in order to further the paramount bankruptcy policy of affording an economic 'fresh start.'"[67] In that connection, the Supreme Court stated in *Grogan* that:

> [A] central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of prëxisting debt.[68]

But it also stated that:

> The statutory provisions governing nondischargeability reflect a congressional decision to exclude from the general policy of discharge certain categories of debts—such as child support, alimony, and certain unpaid educational loans and taxes, as well as liabilities for fraud. Congress evidently concluded that the creditors' interest in recovering full payment of debts in these categories outweighed the debtors' interest in a complete fresh start.[69]

Neither section 523, nor other sections of the Code, defines what constitutes a "willful attempt to evade or defeat a tax," or articulates standards for making that determination, but standards have evolved in the caselaw. Particularly relevant with respect to this matter are the decisions in this Circuit in *Tudisco v. IRS (In re Tudisco)*,[70] and in this District in *Wright v. IRS (In re Wright)*.[71]

## A. Second Circuit Guidance

In *Tudisco*, the Second Circuit (there faced with the relatively easy case of a debtor who failed to file tax returns, at least until a later year, and submitted a "patently false" affidavit to his employer to avoid tax withholding)[72] set forth certain principles for the determination of cases under section 523. But because the facts in *Tudisco* were so egregious, the Second Circuit did not address questions that might come up in a closer case.

The *Tudisco* court did note, with respect to application of section 523(a)(1)(C), that the willfulness exception to discharge "consists of a conduct element (an attempt to evade or defeat taxes) and a mens rea requirement (willfulness)."[73] And it noted that "[m]ost circuits have held that a simple nonpayment of taxes does not satisfy § 523(a)(1)(C)'s conduct requirement."[74]

The *Tudisco* court also noted a conflict in the circuits with respect to whether section 523(a)(1)(C) should also apply to "culpable omissions" as contrasted with

---

**66.** *See Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

**67.** *Stodut v. IRS (In re Stodut)*, 181 B.R. 751, 754 (Bankr.S.D.N.Y.1995) *(citing Grogan, 498 U.S. at 286, 111 S.Ct. 654).*

**68.** 498 U.S. at 286, 111 S.Ct. 654 *(quoting Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)).

**69.** 498 U.S. at 287, 111 S.Ct. 654.

**70.** 183 F.3d 133 (2d Cir.1999) *("Tudisco ").*

**71.** 191 B.R. 291 (S.D.N.Y.1995) *("Wright").*

**72.** *Id.* at 137.

**73.** *Id.* at 136.

**74.** *Id., (citing Haas v. IRS (In re Haas)*, 48 F.3d 1153, 1156 (11th Cir.1995)) *later abrogated in other respects; United States v. Fegeley (In re Fegeley)*, 118 F.3d 979, 983 (3d Cir.1997); *In re Birkenstock*, 87 F.3d 947, 951 (7th Cir.1996); *Dalton v. IRS*, 77 F.3d 1297, 1301 (10th Cir.1996).

"acts of commission" (presumably fraud or more egregious measures toward evasion).[75] It noted the Eleventh Circuit's decision in *Haas*, in which a panel of that court concluded that mere knowledge combined with non-payment of tax obligations was insufficient to meet the requirements of section 523(a)(1)(C)'s discharge exception.[76] But it noted a different view in the Fifth Circuit's decision in *Bruner v. United States (In re Bruner)*,[77] holding that Section 523(a)(1)(C) applies both to "acts of commission" and "culpable omissions."

The *Tudisco* court did not take a position with respect to the *Haas Bruner* divergence of views:

> To the extent that *In re Haas* and *In re Bruner* actually do conflict, we need not, however, decide between them. Because *Tudisco* engaged in more than "mere nonpayment," his conduct constitutes an attempt to evade or defeat taxes under either standard.[78]

Accordingly, this Court does not have guidance at the Court of Appeals level as to whether "culpable omissions" would satisfy section 523(a)(1)(C), and if so, what would constitute *culpable* omissions.

*B. S.D.N.Y. District Court Precedent*

But the Court has meaningful precedent at the district court level. More in-structive than *Tudisco*, and bearing heavily on this Court's decision here, is the decision in *Wright*—which, affirming a decision in the bankruptcy court below that had held the taxes to be nondischargeable, discussed the issues in greater depth, including, in particular, the standard to be applied; the significance of taxpayer decisions to spend available funds on obligations other than unpaid taxes; and the conflict between *Haas* and *Bruner*.

With respect to the standard to be applied, the *Wright* court started by recognizing, as noted above, that section 523(a)(1)(C) does not define what constitutes a "willful attempt to evade or defeat" a tax.[79] But after considering the caselaw on point, it endorsed the standard used in the bankruptcy court there (which in turn had been used in many other decisions, at the court of appeals level and in lower courts),[80] derived from section 6672 of the Internal Revenue Code. This section imposes civil penalties on any taxpayer "who willfully attempts in any manner to evade or defeat any ... tax or the payment thereof"—language similar (but not identical)[81] to the language of section 523(a)(1)(C).[82]

> Under that test, a willful attempt to evade or defeat a tax is established if the debtor (1) had a duty to pay the tax, (2) knew of that duty, and (3) voluntarily

---

**75.** 183 F.3d at 137.

**76.** *Tudisco*, 183 F.3d at 136 (citing *Haas*, 48 F.3d at 1156).

**77.** 55 F.3d 195, 200 (5th Cir.1995).

**78.** 183 F.3d at 137.

**79.** 191 B.R. at 292.

**80.** *Id.* at 293 (*citing Bruner*, 55 F.3d at 200; *In re Toti*, 24 F.3d 806, 809 (6th Cir.1994), *cert. denied*, 513 U.S. 987, 115 S.Ct. 482, 130

L.Ed.2d 395 (1994); *In re Semo*, 188 B.R. 359, 362 (Bankr.W.D.Pa.1995); *In re Freidus*, 165 B.R. 537, 541–542 (Bankr.E.D.N.Y.1994); *In re Laurin*, 161 B.R. 73, 75 (Bankr.D.Wyo. 1993); *Langlois v. United States*, 155 B.R. 818, 821 (N.D.N.Y.1993)).

**81.** The difference was found to be significant in *Haas*, 48 F.3d at 1157, and also in *Gathwright v. United States (In re Gathwright)*, 102 B.R. 211, 213 (Bankr.D.Or.1989), but the majority of courts have found it not to be.

**82.** *See* 191 B.R. at 292–293.

and intentionally violated the duty.[83]

The *Wright* court continued that:

To satisfy this test, it is not necessary to prove that the debtor was inspired by "bad purpose or evil motive" in failing to pay his taxes. It is enough if the debtor "had the wherewithal to file his return and pay his obligation," but *"voluntarily, consciously, and intentionally"* decided to pay other creditors instead.[84]

The debtor taxpayer in *Wright* conceded that "he voluntarily chose to pay other obligations in lieu of taxes," but argued that "he nevertheless did not willfully attempt to evade his tax liability because he had no 'sinister scheme' and because he 'merely chose to allocate his resources to obligations other than taxes.'"[85] This required the *Wright* court to consider the different perspectives in *Haas* and *Bruner* (and later cases that subscribed to the *Bruner* approach) to determine whether section 523(a)(1)(C) requires *affirmative efforts to evade*, as contrasted to a simple knowing allocation of resources to obligations other than taxes. With lengthy analysis,[86] which this Court need not repeat at comparable length here, the *Wright* court followed the *Bruner* approach, stating that it was unpersuaded by the *Haas* reasoning.[87] It noted, in that connection, that there is no ambiguity in the broad language of section 523(a)(1)(C). The *Wright* court continued:

I agree with the *Haas* Court that under a straightforward, "plain" reading of the statute, it will be difficult for a taxpayer who decides to spend his substantial income on expenses other than taxes to

obtain discharge. However, I fail to see why that result is so absurd as to compel the conclusion that the statute cannot mean what it says.[88]

Thus the *Wright* court held that the debtor's knowing allocation of resources to obligations other than taxes *would* constitute the requisite willful attempt to evade or defeat a tax.

## C. Cases Outside The District

Cases outside of this district have similarly held that the knowing allocation of resources to obligations other than taxes constitutes the requisite willful attempts to evade or defeat a tax. In *Haesloop v. United States (In re Haesloop)*,[89] the court held a debtor's tax debt to be nondischargeable where the debtor, an attorney—while he failed to timely file his tax returns; did not make required estimated tax payments; and structured his lifestyle and assets to preclude any meaningful attempt by the IRS to collect on the tax debt other than through pursuit of his income—was principally guilty having chosen to apply his income toward expenses other than payment of his federal taxes. While agreeing that evidence of nonpayment alone does not support a finding that a tax debt is nondischargeable, the *Haesloop* court held that the facts there presented required a finding of "culpable omission," as in, among other cases, *Bruner* and *Wright:*

Plaintiff earned substantial income at all relevant times and chose to apply that income towards expenses other than payment of his federal taxes, and to take

---

83. *Id.* at 292.

84. *Id.* (citations omitted) (emphasis added).

85. *Id.* at 293.

86. *See id.* at 293–295.

87. *Id.* at 294.

88. *Id.*

89. 2000 WL 1607316 (Bankr.E.D.N.Y. Aug.30, 2000).

on substantial new obligations, even though he had the resources to pay his taxes.

. . .

Given Plaintiff's substantial income and prospects for a substantial future income, the Court finds that his attempt to discharge tax debts that he would easily be able to pay in full within a reasonable period of time were he to make reasonable adjustments in his standard of living constitutes a filing in bad faith. Debtor is not the "honest but unfortunate" person for whom bankruptcy relief was designed.[90]

Similarly, the court in *United States v. Angel (In re Angel)*,[91] a relatively early case in the development of the caselaw in this area, anticipated the holdings in the later cases, coming to the same conclusion, with the same logic. There, the debtor, a self-employed attorney, had not engaged in any fraud or even a failure to file returns,[92] but failed to pay his taxes when he chose to allocate his financial resources elsewhere. Once more recognizing that by itself a failure to pay would be insufficient to justify non-dischargeability, the *Angel* court stated:

This is not a case of mere failure to pay. This is a case where the debtor chose to pay other creditors and, in lieu of payment of taxes, purchased a valuable home and numerous luxury items. He had a present ability to pay his taxes with cash in hand and instead bought these items for his own enjoyment. As a result, [the debtor] willfully attempted to evade and defeat these taxes thereby rendering the taxes excepted from discharge.[93]

The *Angel* court further noted, significantly:

The result of this decision is not such as to render all tax debts excepted from discharge when they are not paid. This case distinguishes between the debtor with the present ability to pay who so refuses and the unfortunate debtor without a present ability to repay. Debtors with an inability to pay their taxes with no more culpability will have their tax debts discharged. However, debtors who have cash in hand and, instead of responding to their tax obligations, choose to pay other creditors or purchase luxury items and expensive homes will have their tax debts excepted from discharge.

The purpose of the Bankruptcy Code is to allow honest debtors a fresh start and not to create a device for tax evasion. It is ordered that the tax liabilities for the years at issue are excepted from discharge.[94]

Other cases similarly hold that a debtor's decision to pay other creditors and to purchase discretionary items rather than address tax obligations make the tax debt nondischargeable.[95] So far as this Court can discern, no court has questioned or

---

90. *Id.* at *5 *6.

91. 1994 WL 69516 (Bankr.W.D.Okla.Feb.24, 1994).

92. The debtor had "filed a federal individual income tax return every year since he was fifteen years old." *Id.* at *1.

93. *Id.* at *4.

94. *Id.* at *4–*5.

95. *See United States v. Weiss (In re Weiss)*, 237 B.R. 600, 606 (Bankr.E.D.Pa.1999) (finding debt non-dischargeable "where the debtor chose to pay other creditors and, in lieu of payments on taxes, purchased a valuable home and numerous luxury items" (*citing Angel*, 1994 WL 69516, at *4)), *aff'd in this respect and rev'd in part in other respects*, 2000 WL 1708802 at *4 (E.D.Pa.2000); *Nguyen v. IRS (In re Nguyen)*, 1998 WL 433902, *10 (Bankr.E.D.Pa.1998) (holding debt for certain tax years non-dischargeable for several rea-

noted any exceptions to the principle, as articulated and applied in *Wright, Haesloop, Angel* and the other cases, that the allocation of available income to discretionary expenses and debts other than tax liabilities constitutes a willful act to evade the payment of taxes.[96]

## II.

### Application to Facts Here

The Court then must apply those principles to the facts it has found here. Taking

the tax years separately,[97] but finding no differences for the annual taxes *within* the two groups of tax years—*i.e.*, the 1980s Taxes and the 1990s Taxes—the Court first addresses the issues common to both groups of taxes, and then the separate issues relating to each.

### A. Common Matters

Ms. Lynch's decision, in the 1996 through 1999 time period, to prioritize her spending such that her tax liabilities were

---

sons, one of which was that "[t]his allocation of income to discretionary expenses and debts other than their tax liabilities supports the conclusion that Debtors' failure to pay their tax debts is a voluntary, conscious, and intentional act," citing *Wright*, 191 B.R. at 293), *aff'd in this respect but rev'd in other respects*, 1999 WL 553468 (E.D.Pa.1999), *aff'd without decision*, 211 F.3d 1262 (3d Cir.2000); *cf. In re Griffieth*, 209 B.R. 823, 829–831 (Bankr. N.D.N.Y.1996) (dismissing chapter 7 case, which was filed almost entirely to discharge obligations to the IRS, as bad faith filing when debtors made discretionary payments in substantial amounts, without any "belt-tightening," to exclusion of payment of tax liabilities).

**96.** It is true that the great bulk of the cases in this area that have found nondischargeability have done so in the context of fairly egregious taxpayer acts, which would support a finding of willfulness under a standard requiring affirmative misconduct, or something more than the allocation of financial resources elsewhere. *See, e.g., Wright*, 191 B.R. at 295 (debtor "adroitly manipulated" his personal finances to thwart IRS efforts to collect the taxes he owed, including "rerout[ing] revenue generated by his anesthesiology practice to a new corporation created expressly for the purpose of avoiding the IRS levy," and "closed out bank accounts to impede IRS attempts to locate his assets"); *Haesloop*, 2000 WL 1607316 at *6 (debtor "deliberately structured his lifestyle and assets so as to preclude any meaningful attempt by the IRS to collect on the tax debt other than through pursuit of his future income"). But none of these opinions indicate that application of the principles described above was dependent on

the court's ability to find other taxpayer offenses as well.

**97.** No case seems to have expressly ruled on whether tax years should be considered separately, but that appears to be the usual practice. *See Nguyen*, 1998 WL 433902, at *11 (finding the taxes for three of the seven years in question to be non-dischargeable; reversed on the merits with respect to other tax years, but not with respect to whether they properly were separately considered); *Weiss*, 237 B.R. at 607 (finding the taxes for four of the six years in question to be dischargeable; reversed on the merits with respect to the other tax years, but not with respect to whether they properly were separately considered). *See also Birkenstock*, 87 F.3d at 953 ("And just as nonpayment of tax alone will not justify nondischargeability, an inability to pay debts in *subsequent* years is not a defense to *previous* intentional attempts to evade or conceal one's tax liabilities") (emphasis added); *cf. id.* at 951 (with respect to dispute as to dischargeability for the years 1977–1983, noting that "an attempt to defeat tax in 1974 will not except discharge of an unpaid tax liability for 1980").

That appears to be consistent with the plain language of the statute, section 523(a)(1)(C). It refers to "a tax," section 523(a)(1), and "such tax," section 523(a)(1)(C), rather than to "taxes" in the plural, and tax liabilities are at least normally addressed separately by year. Of course, similar or identical facts may be relevant to multiple tax years, as they are for the 1990s Taxes, on the one hand, and the 1980s Taxes, on the other, each of which has its own common facts and which have many facts common to both.

not paid, is relevant to both groups of tax years. The Court has discussed these at length in its Findings of Fact above. As plainly appears from that discussion, and as the Court has found, Ms. Lynch continued to make a large number of discretionary and, indeed, luxury, expenditures without any discernible effort at "belt-tightening." [98]

■ This Court starts with the recognition that as numerous cases have recognized, "nonpayment of tax alone is not sufficient to bar discharge of a tax liability." [99] As the Seventh Circuit recognized in *Birkenstock:*

> To hold otherwise would be to deny discharge to many honest debtors because mere nonpayment, without more, evidences "not dishonesty but [ ] the defining characteristic of all debtors—honest and dishonest, alike—insufficient resources to honor all of [one's] obligations."[100]

And since taxes are paid on income and with minor exceptions would not be due in the absence of income, it must be true that in nearly every bankruptcy case in which taxes are due, some income came in that was spent somewhere, in some way. Reconciling that with the principle that nonpayment alone does not constitute evasion requires the recognition that at least part of one's income can be spent on living without running afoul of the deemed evasion that results from electing to spend one's money on purchases or obligations other than taxes, so long as it fairly can be regarded as non-discretionary.

■ But here it was not. If Ms. Lynch had spent her money only on purchases and obligations that this Court could have found to be non-discretionary, this Court would not regard the principles of *Wright* and the other cases to have been triggered. Plainly basic food, shelter, utilities, medical services, day-care and perhaps other things [101] fairly should be regarded for these purposes as non-discretionary (at least if not excessive in amount), but here Ms. Lynch's expenditures went well beyond those needs. By electing to make discretionary expenditures on the incremental cost of a Central Park West apartment, the restaurant dining, the credit card purchases and payments, the travel, the tuition and the "tithing," Ms. Lynch evidenced exactly the kind of conduct that resulted in nondischargeability in *Wright, Haesloop, Angel,* and the other discretionary spending cases.

In that connection, the Court makes a number of observations. Plainly shelter is a necessity. Shelter on Central Park West, in a 3 bedroom apartment (for a childless couple) in a doorman building—at a cost of more than $6,000 per month, or $72,000 per year—is not. Paying the incremental cost for housing of that character while federal income taxes remained unpaid was a discretionary expenditure of the type identified in the cases.[102] The Court rejects, as both a fact and a new principle of law, the notion that one can justify expenditures of the type sought to be justified here by the assertion that oth-

**98.** *See Griffieth,* 209 B.R. at 827; *see* discussion *infra* Findings of Fact Part Par. G J.

**99.** *Birkenstock,* 87 F.3d at 951 (*citing Haas,* 48 F.3d at 1158).

**100.** *Id.* (*citing Haas,* 48 F.3d at 1156) (brackets in original).

**101.** Some courts have held that spending on one's children's education is not a necessity. In at least many cases, this Court would not necessarily agree. The Court does not need to decide that today.

**102.** *See, e.g., Angel,* 1994 WL 69516, at *4 (debtor purchased a "valuable home").

ers expect one to live that way. Among many other things, endorsing an argument of this character would create special rules for the wealthy, which this Court will not do.

The Court similarly cannot accept Ms. Lynch's contentions that she needs to dine in restaurants so often, or at the restaurants at which she dines, because she works late, and/or is tired at the end of the day. Those are afflictions suffered by millions of Americans, who do not do likewise. Plainly this too was a discretionary expenditure that Ms. Lynch chose to make ahead of her taxes.

 The Court also rejects the notion that Ms. Lynch could appropriately choose to prefer religious expenditures over the payment of her tax obligations. First and importantly, Ms. Lynch's religious contributions were optional and not required.[103] Her transfers for religiously related reasons were gratuitous and wholly volitional, and while hardly to be criticized when made by a solvent debtor, could not be made ahead of tax obligations. This Court rejects Ms. Lynch's contention that the Court must close its eyes to these expenditures so as to avoid running afoul of the Constitution's Free Exercise clause.[104] For the reasons set forth by Judge Beatty of this Court in *Geltzer v. Crossroads Tabernacle (In re Rivera)*,[105] this Court cannot endorse the view that one can evade payment of tax obligations by making gratuitous transfers out of religious motivation, even if sincere. As Judge Beatty noted in *Rivera*—another case in which an insolvent debtor chose to make religiously driv-

en gratuitous transfers in lieu of satisfying obligations to creditors—the Supreme Court held in *Employment Division v. Smith*,[106] that the Free Exercise Clause:

> [D]oes not relieve an individual of the obligation to comply with a law that incidentally forbids (or requires) the performance of an act that his religious belief requires (or forbids) if the law is not specifically directed to religious practice and is otherwise constitutional as applied to those who engage in the specified act for nonreligious reasons.[107]

Here, of course, as the tithing was only optional and not required in any event, that principle is even more plainly applicable. Under those circumstances, Judge Beatty's analysis in *Rivera* is compelling:

> [P]rior to the time a debtor files a petition, a debtor can not give his or her assets away, whether it is to a church or to anyone else, when it is at the expense of paying creditors. This is not a burden on religion. It is a burden on choice. If individuals choose to donate part of their income to charity, whether religious or secular, they must adjust their expenditures accordingly to live within the confines of their available income.
>
> ... [A]n insolvent should be "just to his creditors before he is generous to others."[108]

And Ms. Lynch's travel, including (especially) her numerous trips to the West Coast and to China; her credit card charges and payments (the overwhelming bulk of which, by reference to the mer-

---

103. *See* pages 74–75 & n. 45 above.

104. U.S. Const. amend. I.

105. 214 B.R. 101 (Bankr.S.D.N.Y.1997).

106. 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

107. 214 B.R. at 106 (*quoting* syllabus, *Smith*, 494 U.S. at 872, 110 S.Ct. 1595).

108. *Id.* at 108 (*quoting* 1 Garrard Glenn, *Fraudulent Conveyances and Preferences* (1940) § 264, at 451).

chants involved and the size of the purchases, plainly appear to be discretionary); and tuition (for Ms. Lynch and her husband, not a child) all must be regarded as discretionary expenditures that Ms. Lynch chose to make, as in *Angel,* for her own enjoyment.

This is a classic array of discretionary expenditures, all in lieu of paying taxes, of the type that results in nondischargeability under the cases cited above. As in *Haesloop,*[109] it disqualifies Ms. Lynch from the status of the " 'honest but unfortunate' person for whom bankruptcy relief was designed."

### B. The 1990s Taxes

The principles set forth above plainly make the 1990s Taxes non-dischargeable. The Court has found that Ms. Lynch could have easily paid the 1990s taxes—initially the relatively small amounts of $11,567 for 1993; $10,812 for 1994; $13,577 for 1995, and which even with interest grew to the relatively small amount of $55,000, in the aggregate, just before the trial of this matter as she made $126,000, $150,000, and $143,000 respectively, after the payment of her other federal and state taxes. She had an even greater ability to pay them in 1996, the year she apparently discovered she had not paid them earlier, when she made $260,000 after her other taxes.

Because Ms. Lynch elected to spend her money elsewhere and not to satisfy her tax obligations—especially when she had the ability to easily pay them in full—the Court necessarily must hold, and it does hold, that she willfully evaded her taxes.

### C. The 1980s Taxes

The same facts and principles apply in substantial part to the 1980s Taxes. Ms.

Lynch's failure to pay the 1980s Taxes took place in the same 1996–1999 time period, and her discretionary decisions to apply her financial resources elsewhere were equally applicable to her 1980s Taxes obligations. Ms. Lynch elected to pay for obligations and purchases other than her taxes, and hence must be found to have evaded payment of her taxes.

The difference—arguably a meaningful difference—is that even if Ms. Lynch had more reasonable spending practices, she could not pay the 1980s Taxes in full. The Court has found that were it not for her knowing decision to spend her income on things other than taxes (and assuming payment in full of the 1990s Taxes, which would reduce her available assets for payment by about $55,000), she would have been able to pay much of the 1980s Taxes—from one-half to somewhat more than that of them—but not all of them. Whether this exempts her from the principles described above, or permits the Court to grant her a partial discharge, is discussed in the next section; for the purposes here, however, the Court necessarily must rule, and does rule, that her conduct is a classic example of the conduct traditionally held to warrant nondischargeability, and subject to the analysis that follows, she must be deemed to have attempted to evade payment of her taxes, with the result that her tax debt is nondischargeable.

### III.

### Effect of Inability to Pay All of the 1980s Taxes

■ The issues remain, then, as to whether the Court has the power under these facts to grant Ms. Lynch a discharge

---

**109.** *See* 2000 WL 1607316 at *6.

anyway, because she could not pay *all* of the tax debt, or to grant Ms. Lynch a partial discharge with respect to the portion of the 1980s Taxes that the Court believes that, even without the discretionary spending abuses, she could not afford to pay. The Court believes that it would be both unjust and contrary to law to do the former. And with some regret—because the Court believes that the interests of neither the IRS nor Ms. Lynch are served by this result—the Court believes that it cannot do the latter either.

As in *Angel*,[110] the analysis begins with the plain language of section 523(a)(1)(C). Section 523(a)(1)(C) provides, as noted above,

> (a) A discharge under section 727 … of this title does not discharge an individual debtor from any debt—
>
> (1) for a tax or a customs duty—
>
> . . .
>
> (C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax. . . .

This plain statutory language means, at the least, that when the requirements of section 523(a)(1)(C) are satisfied, the debtor does not get a discharge in full. And there is nothing in "equity"—assuming that the Court could even consider it—that would warrant rewarding a debtor-taxpayer who willfully attempted to evade the payment of taxes with a full discharge because of the fact that even without such

evasion, the entirety of the debt could not be paid.

The remaining issue—which has an arguable basis in equity, though not necessarily in law—is whether the Court can properly grant a *partial* discharge, to the extent that even without steps to evade, a debtor could not afford to pay. But the Court believes that it does not have the authority to do this either. Once more the Court must look to the words of the statute, quoted in full above. The statute gives no indication of legislative purpose or authorization to make section 523(a)(1)(C) apply to only part of a tax. To the contrary, it refers to a tax "with respect to which" the debtor willfully attempted to evade or defeat such tax. It does not have any additional language providing, in words or substance, that nondischargeability is "to the extent that" the debtor could afford to pay or that the efforts to evade payment were successful. Nor does it refer, in any way, to a portion of any debt.

Just as section 523(a)(1)(C)'s reference to "willful attempts in any manner to evade or defeat" such tax was held to be unambiguous in *Wright*[111] and elsewhere,[112] the statute is likewise unambiguous in this respect. The plain meaning of section 523(a)(1)(C) is that a finding that the debtor willfully attempted to evade or defeat such tax disqualifies the debtor from discharge of the debt in question. And in the absence of statutory language to the contrary, that must be read as meaning the *entirety* of the debt in question.

If the Court were in a position to look beyond section 523(a)(1)(C)'s plain mean-

---

**110.** *See* 1994 WL 69516 at *1 (*citing United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)).

**111.** *See* 191 B.R. at 294 ("I find no ambiguity in the broad language of Section 523(a)(1)(C)").

**112.** *See, e.g., Angel*, 1994 WL 69516, at *2 ("The language of § 523(a)(1)(C) is not ambiguous and does not require proof of an affirmative act to render the tax debt nondischargeable").

ing, to examine it in the context of other statutory provisions, it would come to the same result. Subsections (a)(2) and (a)(7) of section 523(a) *do* use the words "to the extent," and subsection (a)(15) permits a needs-based balancing. All indicate awareness on the part of Congress of its ability to legislate provisions authorizing a fine-tuning of the extent of discharge when the circumstances would warrant it. But such provisions are conspicuously absent here. This Court is not free to engraft such provisions on to the statute when Congress has not done so.[113]

With regret—as it is possible that Congress might on balance conclude, if it thought about it, that a legislative scheme that resulted in nondischargeability only "to the extent" the debtor willfully attempted to evade or defeat her taxes by reason of excessive discretionary payments elsewhere would be more just—the Court does not believe that it has the license to apply the statutory language and caselaw in that fashion. The Court reluctantly concludes that it is required to find that the entirety of Ms. Lynch's federal tax debt is nondischargeable, and the Court so holds.

*Conclusion*

For the foregoing reasons, the Court determines:

(1) Ms Lynch's tax liabilities with respect to the 1990s Taxes are not dischargeable;

(2) Ms Lynch's tax liabilities with respect to the 1980s Taxes are likewise not dischargeable, in whole or in part.

The Government shall settle a judgment in accordance with this decision, on no less than 5 business days' notice by hand or fax, or 10 business days' notice by mail. The time to appeal will run from the time of entry of judgment, and not from the time of entry of this decision.

---

**113.** In the absence of a basis in the statutory language of section 523(a) authorizing partial discharge, caselaw in this District has held partial discharge to be unavailable in the student loan context, under section 523(a)(8). In *Pincus v. Graduate Loan Center (In re Pincus)*, 280 B.R. 303 (Bankr.S.D.N.Y.2002), Judge Beatty of this Court held that section 523(a)(8) did not allow the partial discharge of a student loan debt. She reasoned that neither the language of the statute, nor any invocation of the equity powers under section 105 of the Code, created a basis for the partial discharge of a student loan, and that even with the hardship provisions present in section 523(a)(8)—which are notably absent from section 523(a)(1)—a partial discharge is not allowed, and the entire debt would have to survive entirely or be discharged entirely.